***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon review of the evidence affirms with modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties were subject to the North Carolina Workers' Compensation Act at all times relevant hereto, with defendant-employer employing the requisite number of employees to be bound under the provisions of said Act.
2. An employee-employer relationship existed between plaintiff-employee and defendant-employer at all times relevant hereto.
3. Plaintiff sustained a compensable injury by accident on 28 August 2001.
4. RskCo was the carrier on the risk at all times relevant to this proceeding.
5. Plaintiff's average weekly wage on 28 August 2001 was $1009.42, which yields the maximum compensation rate for 2001 of $620.00.
6. At and subsequent to the hearing, the parties submitted the following: (a) a packet of medical records; (b) plaintiff's personnel file; and (c) Industrial Commission documents.
 ***********
Based upon the foregoing Stipulations and the evidence presented, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of hearing before the deputy commissioner, plaintiff was fifty-one (51) years of age. Plaintiff is a high school graduate and is certified in floral design.
2. Plaintiff began her employment with defendant-employer in approximately 1988 as a material handler/receiving technician. In that capacity, plaintiff was responsible for receiving potatoes from deliverers and sampling potatoes for quality control. Her duties included unloading potatoes from delivery trucks using a hydraulic machine, weighing samples of potatoes in buckets and sorting potatoes in bins according to size and quality. Plaintiff was also required to clean and sweep the area where the potatoes were unloaded.
3. On 28 August 2001, plaintiff sustained an admittedly compensable injury by accident when she fell while climbing a ladder toward a raised platform that was seven (7) to twelve (12) feet off the ground. As plaintiff reached the top of the ladder and was attempting to pull herself up, her hand slipped and she fell, sliding down the ladder to the concrete floor. As a result of her fall, plaintiff sustained a hairline fracture to the radial head of her right elbow, contusions to her right hip, wrist, hand, arm, shoulder and back. She also suffered from pain to both lower extremities. Defendants' have stipulated to the compensability of this accident, and began paying plaintiff temporary total disability compensation.
4. Following the accident, plaintiff was transported by ambulance to the emergency room at Carolinas Medical Center where she underwent a series of x-rays. An x-ray of plaintiff's chest and pelvis revealed no abnormalities. X-rays of plaintiff's right hand, right shoulder and lumbar spine revealed degenerative changes. An x-ray of plaintiff's right elbow revealed a fracture of the radial head with possible tensile ligamentous injury to the medial collateral ligament. An x-ray of her right forearm also revealed a fracture. Plaintiff was treated at the hospital and released with a referral to Dr. David DuPuy, an orthopedic surgeon.
5. Dr. DuPuy initially saw plaintiff on 30 August 2001. Following an examination, Dr. DuPuy determined that plaintiff had normal reflexes, no weakness in the lower extremities, no sciatic nerve involvement and there was no evidence of neurological damage. Additionally, Dr. DuPuy noted that plaintiff had no headache or neck pain, a normal cranial nerve exam, and normal reflexes. Dr. DuPuy diagnosed plaintiff with a right elbow radial head fracture, a neck sprain and contusions to her back, right hip, and right knee. Plaintiff was prescribed medications, given a right arm sling and advised to begin a range of motion physical therapy program. Additionally, Dr. DuPuy removed plaintiff from work for two (2) weeks.
6. On 10 September 2001, plaintiff returned to Dr. DuPuy complaining of pain in her hip, and of her elbow's slow recovery. Dr. DuPuy's examination revealed pain along plaintiff's medial joint line of the right knee with a slight effusion. Dr. DuPuy diagnosed plaintiff with a radial head fracture of the right elbow, a bruised back, a bruised right hip, a neck sprain and a right knee sprain. With these symptoms and additional diagnoses, Dr. DuPuy continued to medically excuse plaintiff from work. He saw plaintiff again on 24 September 2001, at which time she reported continued hip pain. He continued to excuse plaintiff from work.
7. On 8 October 2001, plaintiff reported to Dr. DuPuy that her elbow was much improved and that she had an excellent range of motion, with minimal discomfort of the right hip. Dr. DuPuy released plaintiff to return to restricted, light duty work as of 9 October 2001. Plaintiff's restrictions included no lifting more than ten (10) pounds, no pushing or pulling greater than twenty-five (25) pounds, no prolonged bending, stooping, squatting, or kneeling, and no lifting above shoulder level. Additionally, Dr. DuPuy indicated that plaintiff should not stand or walk longer than twenty (20) minutes per hour.
8. In October 2001, plaintiff returned to work for defendant-employer in a modified job, performing administrative and sanitation duties that were within the restrictions assigned by Dr. DuPuy. While working in the modified job, plaintiff began to experience increased pain and feelings of frustration, depression and anxiety. Plaintiff testified that she believed she could not physically perform her duties even with the modifications.
9. On 4 December 2001, plaintiff reported to Dr. DuPuy that she was experiencing right knee and ankle pain while walking through defendant-employer's facility in the performance of her sanitation duties. Despite her symptoms, Dr. DuPuy increased plaintiff's lifting allowance to twenty (20) pounds and her pulling or pushing allowance to sixty (60) pounds.
10. Plaintiff testified that during the period of October 2001 to December 2001, she received mixed messages from her physicians regarding her physical limitations, and that defendant-employer had unrealistic expectations as to her abilities. In late December 2001, plaintiff went out of work under the Family and Medical Leave Act to assist her mother. Upon her return to work, plaintiff was assigned modified work based on Dr. DuPuy's recommendation that she recondition herself to facilitate her eventual return to full-duty work. In the modified position, plaintiff was permitted to place fewer potatoes in her buckets so her load would be lighter, and she was given a cart with which to push the bucket. Additionally, defendant-employer lowered a lever so that plaintiff would not have to lift her arms overhead. Despite these accommodations, plaintiff continued to experience pain.
11. On 8 January 2002, plaintiff returned to Dr. DuPuy, reporting pain in her right upper extremity that was making it difficult for her to work. Plaintiff also reported decreased strength and requested a referral to a neurologist. Dr. DuPuy denied plaintiff's request for a referral to a neurologist, and instead increased her pulling-pushing restriction from sixty (60) to one hundred (100) pounds.
12. Plaintiff returned to Dr. DuPuy on 5 February 2002 with ongoing complaints of pain and significant emotional problems. At that time, plaintiff had not worked for defendant-employer for approximately two weeks. Dr. DuPuy recommended that she continue to work. Dr. Dupuy was of the opinion that plaintiff had an extreme subjective, emotional overlay and referred her for a functional capacity evaluation (FCE).
13. On 22 February 2002, plaintiff underwent the FCE ordered by Dr. DuPuy. The results indicated that plaintiff was capable of performing light duty work with frequent floor to knuckle lifting of twelve (12) pounds, knuckle to shoulder lifting of nine (9) pounds, shoulder to overhead lifting of six (6) pounds, and a carrying limit of ten (10) pounds for fifty (50) feet with pivoting. The results also indicated that plaintiff gave consistent effort throughout the examination. On 7 March 2002, after reviewing the evaluation results and description of plaintiff's usual job, Dr. DuPuy opined that plaintiff was able to continue performing the light-duty potato receiver position.
14. Just prior to her FCE, plaintiff sought psychological treatment on 12 February 2002 from Dr. Kenneth Carter and Ms. Susan Vigeant of Rock Hill Psychiatric Consultants. Ms. Vigeant is a nurse practitioner who counseled plaintiff under the supervision of Dr. Carter. During the 12 February 2002 appointment with Ms. Vigeant, plaintiff reported being depressed and expressed a desire to return to her normal self. Plaintiff further reported that her depression began when she began to feel powerless in obtaining what she viewed as proper medical treatment for her work related injury.
15. Based upon plaintiff's history and counseling sessions, Ms. Vigeant opined that plaintiff's psychiatric symptoms were caused by the loss of her usual level of functioning and uncertainty about her status at work. Ms. Vigeant diagnosed plaintiff with severe depressive disorder and panic disorder, for which plaintiff was prescribed Wellbutrin, Serzone, Sonata, and Klonopin.
16. Dr. Carter testified that plaintiff suffers from anxiety relating to her inability to support herself, and also diagnosed plaintiff with major depression and panic disorder. Dr. Carter opined that although she has other stressors in her life, plaintiff's psychiatric symptoms were causally related to her 28 August 2001 injury by accident. Additionally, Dr. Carter opined that plaintiff was not capable of returning to work due to her impaired concentration and focus; but he deferred to plaintiff's orthopedic specialist on what plaintiff's physical limitations were.
17. On 7 March 2002, plaintiff returned to Dr. DuPuy, and reported experiencing ongoing pain in her shoulders and arms. In his notes from that date, Dr. DuPuy wrote that plaintiff was just "rambling on and on" about how he did not understand her pain. It was Dr. DuPuy's opinion that plaintiff continued to be able to work with restrictions in the modified job provided by defendant-employer.
18. In June 2002, plaintiff did not work for one week while on jury duty. When that service concluded, plaintiff contacted defendant-employer regarding her return to work and was informed not to return until she was no longer under any restrictions.
19. On 9 July 2002, upon an Order by the Commission, plaintiff was examined by Dr. Neal Taub, a medical specialist in the field of physical medicine and rehabilitation. Based upon his initial examination, Dr. Taub found that plaintiff had persistent right shoulder, hip and knee pain with probable myofascial pain syndrome. Dr. Taub testified that plaintiff's musculoskeletal problems, including the pain in her back, knee, hip, arm, and shoulder are related to her 28 August 2001 injury by accident. Dr. Taub also opined that plaintiff's depression and anxiety were related to her 28 August 2001 injury by accident. Dr. Taub further opined that: (a) plaintiff was capable of working within the restrictions outlined in the FCE; (b) plaintiff needed additional physical therapy; and (c) plaintiff had not reached maximum medical improvement.
20. As of 12 August 2002, Dr. DuPuy released plaintiff to return to her full duties in her former position with defendant-employer. Dr. DuPuy opined that plaintiff reached maximum medical improvement on 5 February 2002 with a fifteen percent (15%) permanent partial disability rating to her right arm, and no permanent impairment to any other body part. Additionally, Dr. DuPuy opined that plaintiff's psychological symptoms and physical conditions beyond the hairline fracture of the right elbow radial head and some initial right hip, arm, and back bruising, were not caused by, aggravated by, or related to plaintiff's injury by accident of 28 August 2001.
21. On 10 January 2003, Dr. Taub prescribed physical and aquatic therapy for plaintiff, which improved her symptoms. Additionally, Dr. Taub prescribed the use of a TENS unit, which also improved plaintiff's symptoms. Dr. Taub testified that plaintiff would continue to experience chronic pain requiring medication or other treatment.
22. Based on the greater weight of the evidence, plaintiff has lost confidence in Dr. DuPuy as her treating physician. Additionally, the evidence shows that plaintiff's conditions and symptoms have improved under the treatment regime provided by Dr. Taub, whose designation as plaintiff's authorized treating physician is approved by the Full Commission.
23. The opinions of Dr. DuPuy on plaintiff's work restrictions and ability to work are given less weight than the opinions of plaintiff's newly designated treating physician, Dr. Taub. Dr. DuPuy's opinion that plaintiff had no restrictions as of 12 August 2002 is contrary to the FCE he ordered, and Dr. DuPuy's testimony that certain symptoms, such as plaintiff's knee pain, were not related to her fall contradicts his medical records.
24. Based upon the greater weight of the evidence, plaintiff's musculoskeletal problems, including pain in her back, knee, hip, arm, and shoulder are causally related to and the direct and natural result of her 28 August 2001 injury by accident.
25. Based upon the greater weight of the evidence, plaintiff's need for treatment for her psychological problems, which, according to Dr. Carter, primarily related to her frustration with efforts to return her to work and her lack of control over her medical care and return-to-work situation, flowed directly from and was a direct and natural result of conditions related to her compensable injury. Plaintiff's psychological problems were not disabling. Plaintiff continued to work while receiving psychiatric consultations and by 26 July 2002, her generalized anxiety disorder had nearly resolved. No weight is given to Dr. Carter's opinion that plaintiff was not capable of returning to work due to impaired concentration and focus.
26. Although the duties of the light duty administrative and sanitation position to which plaintiff returned to work in October 2001 may have been performed by any number of employees in regular positions, there is no evidence of record that the duties as modified for plaintiff were available in a position filled by someone else, or that such a position exists in the competitive job market. Additionally, insufficient evidence was presented upon which to find that the modified version of a Receiving Technician job to which plaintiff was released to return to work by Dr. DuPuy was available to plaintiff or any other employee at any time after June 2002. Furthermore, defendants did not offer plaintiff any job after her June 2002 jury duty even though she contacted defendant-employer about returning to work following completion of her jury duty obligations.
27. As a result of her 28 August 2001 injury by accident to her back, right knee, right hip, right arm, and right shoulder and related conditions, plaintiff has been unable to earn wages in any position with defendant-employer or in any other employment for the period from 7 March 2002 through the present and continuing.
28. Plaintiff has not reached maximum medical improvement.
29. Regarding safety provisions at the site of plaintiff's 28 August 2001 injury by accident, the platform in question did not have side railings or other types of protective guarding. According to plaintiff's testimony, she was not provided a safety belt to use while on the ladder and platform. Plaintiff contends that the lack of a side rail or harness caused her to lose her balance and fall. However, the greater weight of the evidence does not establish that defendant-employer failed to comply with any statutory requirement or lawful order of the Commission by not having a railing at the location where plaintiff fell. There was no order from the Commission requiring railings or harnesses. North Carolina OSHA Standard § 1910.23(c) states that platforms must have railings "except where there is an entrance to a ramp, stairway, or fixed ladder." 13 NCAC 07F.0404(e)(1) only requires safety belts or harnesses where employees are "exposed to platforms that do not meet the requirements of 29 C.F.R. § 1910.23." Plaintiff was still on the ladder in front of the ladder entrance at the time she fell. The ladder entrance complied with29 C.F.R. § 1910.23. Thus, no statute required a railing or harness at the location where plaintiff fell. Furthermore, a railing on the platform would not have prevented the fall that plaintiff suffered.
30. Defendants actions in this matter were reasonable and not indicative of stubborn, unfounded litigiousness.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On 28 October 2001, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Because the compensability of plaintiff's original injury is not in dispute, defendants have the burden of proving that plaintiff's musculoskeletal problems, including pain in her back, knee, hip, arm, and shoulder are not the result of or causally related to her original injury by accident. Parsons v. Pantry,Inc., 126 N.C. App. 540, 485 S.E.2d 867 (1997). Based on the greater weight of the evidence, defendants have met this burden only as to plaintiff's psychological problems.
3. Based on the greater weight of the evidence, plaintiff's musculoskeletal problems, including pain in her back, right knee, right hip, right arm, and right shoulder are causally related to and the direct and natural result of her 28 August 2001 injury by accident. N.C. Gen. Stat. § 97-2(6).
4. As a result of her 28 August 2001 injury by accident and related conditions, plaintiff is entitled to be paid by defendants ongoing total disability compensation at the rate of $620.00 per week for the period of 7 March 2002 through the present and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
5. Plaintiff is entitled to the payment of medical expenses incurred or to be incurred for the treatment of the injury to her back, right knee, right hip, right arm, and right shoulder and her psychological condition related to her injury so long as such treatment is reasonably required to effect a cure, give relief, and/or lessen plaintiff's disability.
6. Plaintiff is not entitled to an additional ten percent (10%) added to her benefits pursuant to N.C. Gen. Stat. § 97-12.
7. Because defendants' actions in this matter were reasonable and were not indicative of stubborn, unfounded litigiousness, plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff ongoing total disability compensation at the rate of $620.00 per week for the period of 7 March 2002 through the present and continuing until further order of the Commission. This compensation shall be paid to plaintiff in a lump sum from the amounts that have accrued. This compensation is subject to the attorney's fee approved herein.
2. Defendants shall pay for all related medical expenses incurred or to be incurred by plaintiff, for the treatment of her back, right knee, right hip, right arm, and right shoulder so long as such treatment is reasonably required to effect a cure, give relief, and/or lessen plaintiff's disability.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded to plaintiff herein is approved for counsel for plaintiff. This fee shall be deducted from the amounts due plaintiff from the accrued compensation and paid directly to counsel for plaintiff; thereafter, counsel for plaintiff shall receive every fourth check.
4. Defendants shall pay the costs, including any remaining unpaid expert witness fees.
5. Dr. Neal Taub is approved as plaintiff's authorized treating physician.
This the ___ day of August 2004.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER